# *VIRGINIA:*

*In the Court of Appeals of Virginia on* **Tuesday** *the* **27**th *day of* **January, 2009**.

Richard Morris Moore, Petitioner,

against          Record No. 1438-08-1

Commonwealth of Virginia, Respondent.

Upon a Petition for a Writ of Actual Innocence

Before Chief Judge Felton, Judges Humphreys and Beales

Richard Morris Moore petitions this Court for a Writ of Actual Innocence pursuant to Chapter 19.3 of Title 19.2 of the Code of Virginia. He contends he is innocent of sodomy and aggravated sexual battery, of which he was convicted in the Circuit Court of the City of Norfolk on October 14, 1992. Pursuant to Code § 19.2-327.11(C), this Court ordered the Attorney General to file a response to the petition. This Court granted petitioner's request for appointment of counsel and permitted appointed counsel to file a reply to the Attorney General's response to the petition.

Upon consideration of the petition, the response of the Attorney General, the reply filed by petitioner's counsel, and the records of prior proceedings in the case, this Court dismisses the petition pursuant to Code § 19.2-327.13 for the follow reasons:

<u>Facts Adduced at Petitioner's June 5, 1992 Bench Trial</u>

From September 1990 through December 1990, the victim, Richard Moore Christianson, Jr.,[1] born on November 14, 1980, lived with his father, petitioner. They resided in a home in Norfolk, Virginia, along with Debra, James, and George Tanner. Petitioner and the victim shared a bedroom in that home. During that time period, the victim's mother lived in Maryland.

---

[1] The full name of the victim as it appears on the trial transcript is "Richard Morris Moore Christianson, Junior, the Second." However, the victim's name as it appears in his notarized statement attached to the petition is "Richard M. Christensen II."

At trial, the victim, then eleven years old, testified that while he was living with petitioner in Norfolk, petitioner "stuck his penis between [the victim's] legs." The victim also stated petitioner made the victim "suck his penis," and petitioner sucked the victim's penis. The victim further explained that when this occurred the petitioner's penis was inside the victim's mouth and his mouth went up and down on petitioner's penis. Petitioner told the victim not to tell anyone about the incidents.

Debra Tanner testified that one night, around 2:00 a.m., during the time the victim and petitioner lived in her home, she saw the victim with "his thing against his father's rectum, pushing his body back and forth against his father with no clothes on." Tanner stated that petitioner looked like he was sleeping, but admitted she did not see his face. On another occasion, Tanner saw petitioner and the victim watching a "90 minute sex tape" without clothing on. Tanner admitted that she had talked to the victim's mother before the trial, and acknowledged that the victim's mother "really didn't want [Tanner] to say anything that would . . . get [petitioner] put in jail." Tanner acknowledged that on two occasions when she confronted the victim about "these things," the victim told her that "it didn't happen," and on two occasions, he told her that "it did happen." She also stated that the victim had a bad reputation for truthfulness.

Debra Moore, the victim's mother, testified that she contacted the police in March 1991 when the victim made allegations to her that petitioner sexually molested him. When the victim's mother confronted petitioner about the allegations, "[h]e told [her] that he did everything with [her] son." When she asked petitioner what he meant by "everything," petitioner responded, "Well, you know, everything . . . sexual activities." Petitioner told the victim's mother that "he had sex with [her] son." The victim's mother testified that petitioner later told her that he was joking about having sex with the victim "because [her] son and [petitioner] were mad at [her]." The victim's mother acknowledged at trial that she was there on behalf of her husband to help him get acquitted, that she believed in petitioner's innocence, and that she did not believe the victim because he "had made a lot of mistakes in

telling her [lies] and contradicting himself and telling [her] that his daddy didn't do it." Thereafter, the trial court declared her a witness hostile to the prosecution.

On cross-examination, the victim admitted telling his mother on one occasion that nothing happened between him and petitioner, because he was afraid and petitioner told him not to tell. The victim admitted telling his grandmother, defense counsel, and Tanner that the incidents never happened. The victim testified that his mother told him she would send him to a home if he didn't tell police what the petitioner had done to him. The victim claimed his mother "didn't like my dad at that point, she told me to say that, and she told me to tell them everything that happened." At trial, the victim denied fabricating anything when he talked to Investigator Debbie Varnell or when he testified at trial. The victim was living in foster care at the time of trial.

In the victim's statement to Varnell in March 1991, the victim said the petitioner stuck his penis [inside] the victim's "butt" and "went up and down," and that the petitioner made him put his penis in the petitioner's "butt." The victim stated that it hurt. The victim also stated that petitioner made him suck the petitioner's penis and the petitioner sucked the victim's penis. The victim told Varnell that "a girl named Debbie" saw some of the molestation. The victim also told Varnell that petitioner told the victim's mother about the molestation because "he knew it wasn't right." The victim acknowledged that he was afraid of petitioner because he used to hit the victim with a coat hanger when he molested the victim.

In finding the evidence overwhelming that petitioner committed sodomy and aggravated sexual battery of his son, the trial judge stated the following:

> When I listened to this child testify on direct, I did not expect to find the defendant guilty. I do not say by that that I did not find the victim a credible witness. I found him a witness who either was confused and lying because the child is mixed up mentally and has had some problems that it causes him not to know reality from truth or else because he has been abused so badly and hurt so much by it that he cannot get his story together for you even though it really happened because it's so painful to him. I strongly suspect that it happened, but I honestly believed, and I think that you know, both of you, that if there is reasonable doubt, I'm not

going to convict somebody. I strongly suspected, but I did not feel that that boy's testimony was beyond a reasonable doubt.

When I heard Mrs. Tanner and from Mrs. Moore, I felt differently. The father of a nine or ten-year-old boy cannot expect me to believe that, as Mrs. Tanner said, he looked as if he was sleeping. He was like there, but she didn't know, didn't see his eyes, and didn't know whether he was asleep or awake. I don't think he could be convicted on this testimony. I don't think the testimony of whether he was aware of it was enough, but, as corroborative evidence, what does it tell me about that child? That his father had watched with friends an explicit movie, sexual movie, that the father then sleeps with the boy after the explicit sexual movie, and the boy, even if the father was asleep, and I don't think he was, the boy was doing what the father directly and through these films thought [sic] him to do.

I found that devastating evidence. . . .

\*　　\*　　\*　　\*　　\*　　\*　　\*

What further corroboration do I have? I have the fact, and there is no doubt, that the boy admitted – He didn't admit as many times as he was asked about . . . . I don't have any reason to doubt his aunt or his grandmother or even his mother that he recanted his story at times.

When Mrs. Moore told me that when she confronted the defendant he told her that he had done everything sexually with that boy – Mrs. Moore did not want to tell me that. She didn't want to testify against him. She was here called by you in order to help him. She was here to tell that the boy recanted. She told me that she spoke to the defendant about it, and he told her that he did everything with his son. She said she asked him what "everything" meant.

I have heard reluctant witnesses, but that was one reluctant witness. She didn't want to say one word against Mr. Moore. She was as reluctant as she could be. To not declare her hostile would have been an abuse of discretion on my part. . . . The defendant said he had sex with his son. . . . He admitted the offense. . . . She knew what "everything" meant, and I know what it meant.

What is the recantation that makes her believe? Not only the son recanted, but the father recanted the confession according to the wife, and what does he say when he does that? He says it was all a joke. Of all the incredible statements I have heard in this courtroom, that is the most extreme. . . .

To me that was the devastating evidence . . . . The defendant admitted it to his wife, and she loves him so much and his mother loves him so much and his sister loves him so much they don't want to believe

him, and this poor, pitiful child, who has been mentally unstable and therefore, ordinarily his testimony, although I might believe he was telling the truth, might have been sufficiently suspect that even though I believed the defendant caused the mental instability in this boy, that nevertheless the catch 22 is it would have caused me not to believe the little boy had there not been the strong corroborating evidence that Miss Tanner saw sexual activity between the son and Mr. Moore taught by Mr. Moore through direct actions and through showing this boy sexually explicit movies and teaching him things that would cause him to be aroused and at an age where he hasn't reached puberty, . . . and to do things with his father that no one should ever do to him.

The testimony of Mrs. Moore who loves her husband so much that she is willing to disbelieve her son reluctantly against her will, torn out of her like pulling hens' teeth that he admitted to her that he did everything with his son. Without that I would have been left with reasonable doubt, but he's been seen undressed. He always went to bed with his son undressed. . . .

As to there being inconsistencies, let me tell you how that struck me. Not only was [the victim] scared, he is under the most excruciating pain. He didn't want to testify today. He was a reluctant witness. He didn't want to talk about it. It is still painful to him. . . . He was humiliated and in pain. It was not the demeanor of a glib witness and a wonderful little liar.

I don't doubt that this boy doesn't have a reputation for truthfulness, and he has been dishonest. . . . If this child has been abused sexually, as I believe he has by his father, mighten he lash out? Mighten he be distrustful of everybody around him? Mighten he accuse everybody but the one person, and think of the humiliation of the young child to think that, if his father did these heinous acts to him, he must be responsible in some way? Isn't it natural that he might recant and be reluctant? It's natural he doesn't want to hurt his father.

You state to me that he told his mother one thing and recanted it as well as to his aunt and grandmother, but I have stated to you those are the people that he cares the most about . . . . They're the people who love the person he is accusing . . . [and] [t]hey don't want to believe it. They have asked the boy to recant it. When he tells me he recanted in your office with his father present and his grandmother present and you present, he would be too terrified not to recant.

He knows what everyone wants from him. He knows what his mother and grandmother want him to say, that it didn't happen. They don't want this man to go to jail. Mr. Moore doesn't want to go to jail, and this boy still loves his father, and he still loves his grandmother and aunt and his mother, and he knows what the condition of his love is. They want him to say that Richard Moore didn't do this, and so he has gone

back and forth. I believe that's the reason he has gone back and forth, but it would, nevertheless, cause me not to convict him because of the chance if I'm wrong had it not been for the strong corroborating evidence.

A man doesn't admit to his wife that he has done everything sexual with a little boy if it isn't true, and the reason he has said he recanted it is absurd, and I reject it out of hand.

Why didn't he describe it as complete in court? Because the boy is in pain and terrified. How was he able to open up to Investigator Varnell? We have seen on the stand she is a sweet, lovely lady. She's young and pretty. She sat in a room alone with him, not in a terrifying courtroom filled with people, most of them strangers and some of them the people who don't want him to say what he is saying . . . . He treated this like an ordeal today. He said what he had to say, and that's all he was going to say. He didn't want to say one word more. He didn't even defend himself. His demeanor was such that he sunk down in the chair. All he wanted to do was get out of this courtroom.

### Victim's 2004 Notarized Statement

In support of his petition for a writ of actual innocence, petitioner alleges his innocence based upon a notarized statement dated March 25, 2004 and signed by "Richard M. Christensen," almost twelve years after petitioner's trial. In that statement, the victim alleges that in 1991 when he was ten years old, he was staying with his mother and father for the first time in his life. He asserts that at that time, his mother told him to say his father molested him, because "she was mad at him & wanted to get him locked up & [i]nto trouble." The victim further states that his mother repeatedly told him that if he didn't say what she wanted him to say that "she would put [him] in TPI (Tidewater Psychiatric Institute)." The victim states that he was scared and believed his mother would "leave [him] again," so he said the things she forced him to say about his father molesting him. The victim asserts he is old enough now to see he was wrong for saying those things. The victim states that his "father did in no way sexually force himself on me or do anything in a sexual manner. It was all of my mothers doing!!!" The victim states he does not know the whereabouts of his mother, having never seen or heard from her since 1991, when he was placed in a foster care home. The victim requests that his father "be released & free to live a normal life."

-6-

To obtain a writ of actual innocence under the provisions of Code §§ 19.2-327.10 through -372.14, a petitioner must allege and prove, among other things, that the newly-discovered evidence

> (1) "was previously unknown or unavailable to the petitioner or his trial attorney of record at the time the conviction became final in the circuit court;" Code § 19.2-327.11(A)(iv);
>
> (2) "is such as could not, by the exercise of diligence, have been discovered or obtained before the expiration of 21 days following entry of the final order of conviction by the court;" Code § 19.2-327.11(A)(vi);
>
> (3) "is material and when considered with all of the other evidence in the current record, will prove that no rational trier of fact could have found proof of guilt beyond a reasonable doubt;" Code § 19.2-327.11(A)(vii); and
>
> (4) "is not merely cumulative, corroborative or collateral." Code § 19.2-327.11(A)(viii).

> The petitioner bears the burden of proving these four elements by clear and convincing evidence. Code § 19.2-327.13.

Carpitcher v. Commonwealth, 273 Va. 335, 343-44, 641 S.E.2d 486, 491 (2007).

In construing a petitioner's burden of proof on a petition for a writ of actual innocence involving

a witness' recantation, the Supreme Court recognized the following in Carpitcher:

> By enacting these provisions, the General Assembly intended to provide relief only to those individuals who can establish that they did not, as a matter of fact, commit the crimes for which they were convicted. The statutes governing writs of actual innocence based on non-biological evidence considered as a whole, and Code § 19.2-327.11 in particular, were not intended to provide relief to individuals who merely produce evidence contrary to the evidence presented at their criminal trial.
>
> With this legislative purpose in mind, we hold that to be "material," within the meaning of Code § 19.2-327.11(A)(vii), evidence supporting a petition for a writ of actual innocence based on non-biological evidence must be true. Manifestly, evidence that is false cannot be "material" under the terms of the statute.
>
> The type of evidence at issue here, recantation evidence, plainly illustrates the necessity of this particular construction of the statute. If we

were to permit evidence that may not be true to support a writ of actual innocence, we would be required to grant every petition seeking relief from a conviction when a trial witness, whose testimony was essential to establishing one or more elements of a crime, has completely recanted [his or] her trial testimony. Such a construction of the statute would defeat the legislative intent of restricting relief only to those individuals who can establish that they did not commit the crime for which they have been convicted.

. . . We observe that recantation evidence is generally questionable in character and is widely viewed by courts with suspicion because of the obvious opportunities and temptations for fraud.

Unless proven true, recantation evidence merely amounts to an attack on a witness' credibility by the witness [himself]. As we [have] stated . . . in approving a circuit court's denial of a motion for a new trial based on recantation evidence, "while we know from [her] lips that this witness spoke falsely on one occasion, this does not establish that [her] testimony at the trial was false and the [later] statements . . . were true."

Id. at 345-46, 641 S.E.2d at 492 (citations omitted). Furthermore,

The requirements of Code § 19.2-327.11(A)(vii) are stated in the conjunctive, requiring proof that "the previously unknown or unavailable evidence is material *and* when considered with all of the other evidence in the current record, will prove that no rational trier of fact could have found proof of guilt beyond a reasonable doubt. " Therefore, to meet this statutory burden, [petitioner] [is] required to prove both that the recantation evidence [is] true and that, when considered with all the other evidence in the current record, no rational trier of fact could have found him guilty of the crimes.

Id. at 347, 641 S.E.2d at 493 (citation omitted).

Here, the petitioner has failed on both accounts. The victim's 2004 recantation is inconsistent with the 1992 trial testimony of other witnesses, who provided evidence that strongly corroborated the victim's accusations against petitioner. Furthermore, the factual predicate used to support the victim's recantation, *i.e.*, that his mother forced him to testify that his father sexually molested him, is belied by the current record. Thus, petitioner has failed to prove the 2004 recantation is true. Moreover, considering the victim's 2004 recantation with all the other evidence in the current record, we cannot say that no rational trier of fact could have found petitioner guilty of the crimes.

-8-

In his 2004 notarized statement, the victim claims that when he testified at the 1992 trial, he accused petitioner of molesting him because his mother forced him to do so. He alleges that she was angry at petitioner and wanted him jailed. The victim further alleges his mother threatened to put him in TPI, and he was afraid she would leave him, as she had done before. However, the record shows that at trial, the victim's mother was a reluctant witness against petitioner. She asserted that she believed the petitioner was innocent and that she did not believe the victim's testimony. She attempted to discredit the victim's testimony by stating that he was untruthful and had a bad reputation for veracity, and she readily admitted that she was there to get petitioner acquitted. Consequently, the victim's mother's trial testimony totally undermines the victim's assertions made now, twelve years after petitioner's trial, that the mother forced the victim to testify against petitioner. Quite the opposite is true. Rather than showing the mother wanted the victim to testify against petitioner, the record shows she wanted to exonerate petitioner. Thus, the victim's mother's trial testimony renders the victim's assertions about her in the 2004 notarized statement inherently incredible.

Furthermore, as recited herein, the current record makes it abundantly clear that the victim's credibility was tested in 1992, as the trial court was presented with evidence of conflicting accounts and recantations by the victim at that time. Thus, another recantation at this time would be merely cumulative of evidence in the current record. While acknowledging concerns with the victim's testimony, the trial court, in finding petitioner guilty, relied upon the "strong corroborating evidence," including the testimony of Tanner, who saw petitioner and the victim engaged in sexual activity, the victim's mother's testimony that petitioner told her he had sex with the victim, which the trial judge noted the mother clearly did not want to divulge to the court, and the victim's statement to Varnell detailing the sexual molestation made in a non-threatening setting. In fact, the trial court found Tanner's and the mother's testimony "devastating evidence" against petitioner. Thus, the trial court considered the victim's recantations to his mother, his grandmother, his aunt, and defense counsel, but based upon

all the evidence before it, including the victim's demeanor and manner of testifying, concluded that the victim's accusations against petitioner at trial were proven beyond a reasonable doubt.

Accordingly, in light of the strong corroborating evidence of petitioner's guilt in the current record, aside from the victim's testimony, and the trial court's consideration of the victim's recantations in 1992 in light of that evidence, we find as a matter of law that petitioner has not met his burden of showing the victim's 2004 recantation, made almost twelve years after petitioner's trial, is true and not merely cumulative. The victim's trial testimony was found credible not based solely on its contents and the victim's demeanor, but rather in light of the strong corroborating evidence, which included petitioner's admission to the victim's mother that he had sex with her son and direct eyewitness testimony of sexual activity between petitioner and the victim.[2]

In summary, we conclude that petitioner has not met the statutory burden of proving by clear and convincing evidence both that the 2004 recantation evidence was true and not merely cumulative and that, when considered with all the other evidence in the current record, no rational trier of fact could have found him guilty of the crimes.

Accordingly, we dismiss the petition and deny petitioner's request to remand to the circuit court for an evidentiary hearing, as the pleadings and records before us do not support petitioner's claim for relief.

Because the issues addressed herein are of first impression and potential litigants and members of the bar may benefit from the directives herein, we direct the Clerk to publish this order.

This Court's records reflect that Amanda McDonald Wiseley, is counsel of record for petitioner in this matter. The Circuit Court of the City of Norfolk shall allow said court-appointed counsel the fee

---

[2] Code § 19.2-327.11(C) allows the Commonwealth's response to contain "a proffer of any evidence pertaining to the guilt of the petitioner that is not included in the record of the case, including evidence that was suppressed at trial." As such, in its response, the Commonwealth argued that petitioner's confession to police, which was suppressed in the trial court, shows the victim's trial testimony to have been true.

set forth below and counsel's necessary direct out-of-pocket expenses. The Commonwealth shall recover of petitioner the costs in this Court. The Attorney General shall recover of the petitioner his costs expended herein.

Costs due the Commonwealth by petitioner in
 Court of Appeals of Virginia:

       Attorney's fee      $400.00  plus costs and expenses


Attorney General's costs:

      Attorney's fee      $50.00

A Copy,

Teste:

*original order signed by the clerk of the Court of Appeals of Virginia at the direction of the Court*

                       Clerk